**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| |
|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> GORDON LAURIA. |

No. 3:23-cr-62-4 (OAW)

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Gordon Lauria was indicted for Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1). ECF No. 21. On December 1, 2023, Mr. Lauria moved to suppress evidence which he argues was the fruit of an unlawful search of his cellular phone. ECF No. 297. The government submitted its written opposition on December 22, 2023. ECF No. 324. For the below reasons, the motion hereby is **DENIED.**

**LEGAL STANDARD**

Mr. Lauria moved to suppress all evidence and communications obtained from a search of his cellular phone, which itself was performed pursuant to a wiretap order authorized by a judge on August 2, 2022. He asserts that the wiretap order was facially insufficient. He argues first that the interceptions were not supported by probable cause, and second, that a wiretap on Target Telephone 5 was unnecessary and that there is "no evidence submitted to support why this wiretap was necessary[,] and that the information sought would not be otherwise available through the ongoing wiretap of [codefendant] Taylor's phone." ECF No. 297-1 at 8.

1

Wiretap warrants are governed by 18 U.S.C. § 2510 *et seq.* (also referred to as "Title III").[1] Title III "creates a comprehensive scheme limiting the use of various forms of electronic surveillance, providing under what circumstances electronic surveillance may be employed, and controlling the later use of information obtained by such means." *Gardner v. Newsday, Inc.*, 895 F.2d 74, 76 (2d Cir. 1990). Congress sought to balance privacy rights with the legitimate needs of law enforcement. *United States v. Concepcion*, 579 F.3d 214, 217-218 (2d Cir. 2009).

To authorize a Title III wiretap, a court must determine, based on facts submitted by the applicant, that

> there is probable cause to believe (1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and (4) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap.

*See* 18 U.S.C. § 2518(3)(a)–(d); *United States v. Diaz,* 176 F.3d 52, 110-11 (2d Cir. 1999), *United States v. Wagner,* 989 F.2d 69, 71 (2d Cir. 1993), *United States v. Solomonyan*, 452 F. Supp. 2d 334, 343 (2006), *United States v. Ambrosio,* 898 F. Supp. 177, 181 (S.D.N.Y. 1995).

Probable cause under Title III "is the same as . . . for a regular search warrant." *Diaz*, 176 F.3d at 110 (citation omitted). "Probable cause is not a particularly demanding standard. 'It is clear that only the probability, and not the prima facie showing, of criminal activity is the standard of probable cause.'" *United States v. Scala,* 388 F. Supp. 2d 396, 401 (S.D.N.Y. 2005) (quoting *Ill. v. Gates,* 462 U.S. 213, 235 (1983)); *see Mara v. Rilling*,

---

[1] Title III is part of the Omnibus Crime Control and Safe Streets Act of 1968.

921 F.3d 48, 69 (2d Cir. 2019*)* ("Probable cause does not demand that an officer's good-faith belief that a person has committed a crime be correct or more likely true than false"). "Probable cause to issue a wiretap order exists when the facts made known to the issuing court are 'sufficient to warrant a prudent man in believing' that evidence of a crime could be obtained through the use of electronic surveillance." *United States v. Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)), *aff'd sub nom. United States v. Aulicino*, 44 F.3d 1102 (2d Cir. 1995); *see United States v. Harris*, 403 U.S. 573, 577–79 (1971)).  Law enforcement is entitled "to draw reasonable inferences from these facts in light of their knowledge of the area and their prior experience." *United States v. Ortiz*, 422 U.S. 891, 897 (1975), *United States v. Pabon*, 871 F.3d 164, 173 (2d Cir. 2017) (noting that probable cause is to be assessed "from the perspective of an objectively reasonable police officer, recognizing that the officer is entitled to draw reasonable inferences on the basis of his prior experience."). While law enforcement may lean on experience in applying for a wiretap order, the eventual discovery of the fruits of a crime cannot retroactively support a finding of probable cause, because courts "do not evaluate probable cause in hindsight, based on what a search does or does not turn up." *Florida v. Harris*, 568 U.S. 237, 249 (2013).

"The affidavit supporting the application for electronic surveillance must be read as a whole, and construed in a realistic and common-sense manner, so that its purpose is not frustrated." *Ruggiero*, at 399; *see United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir. 1980), *cert. denied,* 446 U.S. 953 (1980) (noting "conspiracy by its very nature is a secretive operation," and so it may be established through circumstantial evidence).

3

Thus, courts "must look at the snowball, not the individual snowflakes." *United States v. Reid*, 650 F. Supp. 3d 182, 194 (S.D.N.Y. 2023) (quoting *Scala*, 388 F. Supp. 2d 402).

In the context of a surveillance application, otherwise ambiguous conversations may be the basis for a finding of probable cause, provided that the particular language is reasonably interpreted. *United States v. Wagner*, 989 F.2d 72. And, even if the use of slang or code words for narcotics may not form the sole basis of probable cause, it is "supportive of" a probable cause finding. *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) (stating that "[u]se of such a narcotics code is certainly supportive of a probable cause finding," regardless of whether "narcotics code can provide the sole basis for the issuance of a warrant" (internal quotation marks and citation omitted)). That Mr. Lauria can weave an innocent explanation from these factual threads does not negate probable cause. *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985), *United States v. Gotti*, 42 F. Supp. 2d 252, 280 (S.D.N.Y. 1999) (holding differing reasonable interpretations of conversations do not warrant a *Franks* hearing or suppression when the meaning of those conversations is ambiguous). Even if the innocent explanation were correct, the fact that an affiant may have been mistaken in some of his interpretations of the presumed code will not invalidate his affidavit if he had been justified in his presumptions that coded conversations were occurring and that they were indicative of the suspected crimes. *United States v. Feola*, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

As low as the probable cause threshold of Title III may be, it is a necessary one, nonetheless. Indeed, the intrusion must be necessary. "Generalized and conclusory statements that other investigative procedures would prove unsuccessful" will not satisfy

the balance struck by Title III. *Concepcion*, 579 F.3d 218. "To be sure, the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *Id.* Rather, "[t]he issue of whether a normal investigative method has been exhausted must be tested in a practical and common-sense manner." *Diaz*, 176 F.3d 111.

A reviewing court accords "great deference" to a probable cause determination in a wiretap warrant and will uphold that determination if there was a "substantial basis" for believing that the wiretap would uncover evidence of criminal activity. *Gates*, 462 U.S. 236–39; *see Spinelli v. United States*, 393 U.S. 410, 419 (1969), *United States v. Gallo*, 863 F.2d 185, 191 (2d Cir. 1988); *United States v. Nersesian*, 824 F.2d 1294, 1306 (2d Cir. 1987).

### A. Judge Dooley's Basis for Finding Probable Cause

Mr. Lauria's argument stands on four pillars: four conversations between himself and codefendant Willis Taylor ("Taylor"), occurring on June 17, 2022 (Affidavit pp. 72-77), July 1, 2022 (Affidavit pp. 77-81), July 4, 2022 (Affidavit pp. 81-85) and July 6, 2022 (Affidavit pp. 85-88), which he claims fail to amount to probable cause.[2] The court considers his arguments *seriatim*.

#### 1. The June 17, 2022, Conversation Between Mr. Taylor and Mr. Lauria

In the first conversation, Mr. Lauria claims that he merely "authorized" Mr. Taylor to share his phone number with codefendant Mark Apotrias. He asserts that investigators do not claim he ever spoke with Apotrias and that they failed to connect him to any affirmative act in furtherance of the Drug Trafficking Organization ("DTO").

---

[2] As correctly noted by the government, the August 2, 2022, affidavit incorporates previously submitted affidavits. *See* ECF No. 327 at ¶¶ 11, 27.

5

This claim is unavailing.  The conversation's transcript begins with Mr. Taylor asking Mr. Lauria if he wants to "handle…two (2) three (3) and a halves (1/2) to my guy,"[3] (referring to Mr. Apotrias, given later communications).  Aug. Aff. ¶ 126.  Mr. Lauria asked "what time" he would need to meet Mr. Apotrias and Mr. Taylor explained that "[Mr. Lauria and Mr. Apotrias could] work it out," as Mr. Apotrias was "usually…working in his truck and you meet him somewhere."  *Id.*  Minutes later, Mr. Taylor texted Mr. Apotrias and explained that Mr. Lauria (a "mutual friend") would "take care of you" but that Mr. Apotrias could contact him in the event of "any issues."  *Id.* ¶ 130.  Mr. Taylor assured Mr. Apotrias that the defendant would provide "the same stuff I always had" and "if [Apotrias] did not like it," he could tell Taylor.  *Id.* ¶ 132.  Mr. Apotrias also wanted to confirm that the purchase would be for "the same price."[4]  *Id.*  Minutes later, Mr. Apotrias reached out to Mr. Lauria by phone call and text message several times within a five-minute span, which was "indicative of coordination prior to a meeting for controlled substances."  *Id.* ¶ 5.

The affiant reasonably interpreted the coded conversation between Mr. Lauria and Mr. Taylor (and subsequent conversations between Mr. Taylor and Mr. Apotrias) to suspect that the duo were coordinating who would supply Apotrias with drugs.  Indeed, Mr. Taylor asked for Mr. Lauria to "handle…three and a halves" to Mr. Apotrias.  The affiant explained that 3.5 grams is equivalent to one-eighth of an ounce, a quantity "commonly used as a measurement of cocaine and more commonly referred to as an

---

[3] Further, the Affiant's explained that "narcotics traffickers often use cellular telephones and often speak to one another using coded, cryptic or slang words and phrases." Aug. Aff. ¶ 5.  The affiant based this conclusion on his training and experience.  Indeed, "drug dealers rarely speak openly about their trade" and choose to speak in "narcotics code."  *Cancelmo*, 64 F.3d 808.

[4] Mr. Apotrias referred to the purchase of "bikes."  This could be viewed as similar coded language as his previous conversations with Mr. Taylor, including the June 28, 2022, call where he requested "28 players" for something to do with basketball.  He also referenced "shiny sneakers." Aug. Aff. ¶ 97. The transcript suggests a level of nervousness or hesitation inconsistent with speaking about "bikes," and a conversation about the purchase of bikes (plural) is not plausibly consistent with references to "the same stuff."

6

'eight ball.'" *Id.* ¶ 127.  That alone certainly supports finding probable cause, and certainly with Mr. Apotrias's insistence on knowing the quality and price of the product being provided, as well as confirmation that the seller was known to him.  *Id.* ¶ 132.  Further supporting the court's finding, codefendant Taylor indicated that Mr. Lauria would need to meet Apotrias in his vehicle (hardly a typical place for transacting normal business). *See United States v. Pitts*, No. 10-cr-0703 (ECR), 2011 U.S. Dist. LEXIS 26278, *14 (E.D. Pa. Mar. 15, 2011) (denying motion to suppress, in part, because meeting in the defendant's car supported a "significant amount of suspicion").  Lastly, that Apotrias never called Taylor despite his invitation to do so should he be unable to connect with Lauria tends to show that Apotrias ultimately was able to complete his transaction with Lauria.

To be clear, the undersigned finds this conversation alone to amount to sufficient probable cause to justify the surveillance then sought, and that Mr. Lauria did far more than agree to allow his phone to be provided to a common acquaintance.  He agreed to deliver two "three-and-a-halves" after travelling from "all the way in Wallingford," *id.* ¶ 126, a trip that would be unnecessary in simply authorizing distribution of his phone number.

2. The July 1, 2022, Conversation Between Mr. Taylor and Mr. Lauria

Mr. Lauria suggests the telephonic conversation between himself and Mr. Taylor on July 1, 2022, indicates the pair was discussing "domestic tranquility" and "problems they have had or are having with other mutual acquaintances and about looking them up (and their criminal cases) online."  At the outset, it is worth noting "domestic tranquility," interpersonal issues with mutual friends, and furthering the objectives of the DTO are not mutually exclusive.

The affiant's interpretation of the July 1, 2022, call is reasonable.  The conversation took place approximately two weeks after Mr. Taylor called Mr. Lauria, referred to the Kendall Street Shop as "our shop," and discussed meeting Mark Apotrias.  Aug. Aff. ¶¶ 125-34.  The affidavit describes how Mr. Taylor expressed frustration about "chaos in the house."  "[I]t kills me," he told Mr. Lauria.  The affiant believed Mr. Taylor was discussing a situation involving his associates that caused him to doubt whom he could trust.  *Id.* ¶¶ 135-36.  Mr. Lauria responded "I know who I'm dealing with.  I know who's who and ... I don't need to question nobody.  You know what I'm saying?  I, I got so much experience in this."[5]  A reasonable interpretation of these comments is that he was advising Mr. Taylor based on his criminal organization "experience," that he surrounds himself with people whom he knows to be loyal.  Further, it supports an inference that the two codefendants shared mutual respect and trust, and that they had suspicions about other members of the DTO.  Defendant omits from his brief what took place next.

During the same call, Mr. Lauria remarked "I know one thing about...you know what I mean?  It don't surprise me.  It don't surprise me.  **What [Third-party][6] did with you**…" *Id.* ¶ 136 (emphasis added).  Perhaps out of concern of knowing "who's who," the two began discussing conducting a background check on [Third-party] to see "how many cases [they] was on." *Id.* ¶ 137.  The affiant believed they "were discussing this individual in an attempt to identify if the individual could compromise their collective criminal activities." Running a background check on an associate supports a probable cause finding given the context of that conversation.  Indeed, the affiant reasonably points out

---

[5] Mr. Lauria previously had been convicted of conspiracy to distribute cocaine (among other things) in violation of 21 U.S.C. §§ 841(a)(1); 846, Judgment, 3:96-cr-185, ECF No. 247 (April 2, 1998), and he was granted compassionate release from prison, *id.* at ECF No. 700; 23-cr-62, ECF No. 297-1, at 2.
[6] This person is a nonparty; thus, it is not necessary to include their name.

8

that Taylor and Lauria were searching criminal dockets to uncover the identities of potential cooperators.  *Id.* ¶ 139.  This reasonably could be viewed as an attempt to assure themselves of the integrity of their alleged conspiracy.

Taken together, the July 1, 2022, conversation certainly supplements the existence of probable cause, particularly when considered alongside additional communications cited in the government's applications with which Mr. Lauria does not contend.  *See United States v. Gilliam*, 167 F.3d 628, 633 (D.C. Cir. 1999) ("While each fact standing alone may be insufficient, the combination of all the facts can establish probable cause…and certain conduct that may appear 'innocent to a lay person may have entirely different significance to an experienced [law enforcement] officer'").

    3.  <u>The July 4, 2022, Conversation Between Mr. Taylor and Mr. Lauria</u>

Defendant argues, at worst, this conversation between himself and Mr. Taylor involves his "cautioning Taylor against trusting others who would take advantage of him" and advising him to imitate Mr. Lauria.  ECF No. 297-1, pg. 6.  The transcript of the call suggests otherwise:

> LAURIA: I was trying to tell you.  I was trying to tell you people will cover.  Let me, let me explain something to you.  I learn something in life, when people start covering each other hiding shit . . .
> TAYLOR: Yeah.
> LAURIA: It's dangerous.  It's dangerous.
> TAYLOR: Yeah.
> LAURIA: You know what I mean?  You gotta understand.  [Pause] Lenny's in that [Voices Overlap]
> TAYLOR: Me and you are like open books, man.  You can go look in anything you want.
> LAURIA: That's right.  But you gotta be careful with all of them.  They're all in a conspiracy.  Remember that.  It was a conspiracy.  They're all covering for each other.  They all have dirt on each other.  Remember that.
> TAYLOR: Yeah.

9

> LAURIA: I told you straight up the deal. These guys were hiding information from us. When someone hides information it means one thing: they got dirt on each other.

Aug. Aff. ¶140.[7] Mr. Lauria expresses concern about other people "covering each other," "hiding" pertinent facts, and he warns Mr. Taylor that it is "dangerous." He called people covering for one other "dirty motherf[ ]ers" and reiterated that Mr. Taylor should not "trust none of these guys." *Id.* ¶ 141. The two then continue to discuss who could be trusted and emphasized one person in particular who "was right about all them dirty white boys…right from the beginning. He didn't trust none of them." *Id.*

As discussed by the affiant, the thrust of this conversation seems to be that Mr. Lauria was concerned about the integrity of Mr. Taylor's group and determining whom the defendant felt he could trust. Mr. Lauria specifically defined who Mr. Taylor could trust: "I think it's gonna be four (4) of us…[t]he Iceman. Me. You, and [stammers] and Speedy." *Id.* ¶144. Those comments reasonably may be construed to establish the type of organizational hierarchy often present in drug conspiracies. Mr. Lauria's attempt to establish structure could be interpreted to be in response to perceived threats, namely the "dirty white boys" whom he "didn't trust" because he felt they were "dangerous." The strength of a conspiracy is in its secrecy, and an attempt to insulate the core group from others could be further construed as an attempt to maintain the integrity of the DTO. *See Provenzano,* 615 F.2d 45.

Further, Mr. Lauria noted, "I've been paying my bills. Paying my taxes. They mean nothing to me. They mean nothing to me." The affiant stated, through training and experience, the term "paying taxes" means "making a payment to a greater criminal

---

[7] The excerpts are provided as written.

10

organization for the right to conduct illegal activity." Indeed, accepting the defendant's version as true, the comment does not make sense in context. Thus, this conversation also supports Judge Dooley's finding of probable cause.

### 4. The July 6, 2022, Conversation Between Mr. Taylor and Mr. Lauria

The fourth pillar upon which Mr. Lauria's argument rests is another phone call between himself and Mr. Taylor, on July 6, 2022. The night before, Sean Pepe, an alleged co-conspirator, was arrested by police shortly after leaving Willis Taylor's home. *See* ECF No. 1, ¶¶ 48-51. Against that backdrop, Mr. Lauria and Mr. Taylor spoke during the following night:

> LAURIA: How about Shane, I mean Sean?
>
> TAYLOR: I don't know.  He's kind of... He's kind of... He's kind of bummed man.  He got no car till the 18th
>
> LAURIA: Why they take his car?
>
> TAYLOR: I don't, for evidence.  They might [Voices Overlaps]
>
> LAURIA: Evidence for what?
>
> TAYLOR: I don't know.  They might have found the uh ... They might have found somethin' in it.
>
> LAURIA: Oh my god.  Did he get charge for anything?
>
> TAYLOR: No!
>
> LAURIA: Is under investigation then.
>
> ***
>
> LAURIA: Yeah.  They gonna find out on the 18th.  They found somethin', they impounded the car.  They found somethin' and then gonna, they gonna put another warrant out for him.  Once they test it.  [Voices Overlaps]
>
> TAYLOR: Yeah.  Well, once they test it.  Yeah, that's what I told him last night.  They wouldn't done it last night unless they would take a [U/I] tested it.
>
> LAURIA: They sent it out to a laboratory they couldn't test it.  It was something they couldn't test there.
>
> TAYLOR: Right.

LAURIA: You know what that is.  You know what I'm saying?

TAYLOR: Nah oh, I know, I know what it is.  Was uh ... Orange, orange diamonds.

LAURIA: Yup!

\*\*\*

LAURIA: I don't know.  It ain't nothing big.  You know what I'm saying?  It's uh [Voices Overlap]

TAYLOR: Yeah nah.  I know.  It's not, you know.  It's not [stammers] You know, there's an argument is not for sale.

LAURIA: Yeah.  Is personal use, is like how many [Voices Overlap]

TAYLOR: Alright.  [Voices Overlap]

LAURIA: . . . they caught a lot.  Depends how many he had.  [Voices Overlap]

TAYLOR: Yeah.  Right.  Uh [Voices Overlap]

LAURIA: You know.  Is [Voices Overlap]

TAYLOR: Is [Pause] 70.

LAURIA: 80?  70?

TAYLOR: Yea.  70, 80. yeah [Voices Overlap]

LAURIA: Well, they gonna test what's in it.  And they're gonna weight it, and then he's gonna get charged.

TAYLOR: Yeah.  [Voices Overlap]

LAURIA: If is over the, if is over uh . . . The amount for usage, then he'll get "sale," You know what I mean?

TAYLOR: Yeah.  Well I, I, I'll go and uh, I'll do the math on them right now.  I, I know [pause] what's in it.  LAURIA: Yeah.  You gotta do the math and you know what's in it.  You know what I mean.

"In the later portion of the call, Taylor explained to Lauria that Pepe had been caught with 70 or 80 'orange diamonds'—consistent with the 85 orange pills that law enforcement seized from Pepe, that later were tested and determined to be methamphetamine." Gov't Mem., ECF No. 324, pg. 17.  That Mr. Lauria understood what Mr. Taylor meant by "orange diamonds," together with their discussion about the consequences of law enforcement weighing the subject matter certainly supports probable cause.  A reasonable interpretation of this conversation is that Mr. Lauria knew

that the tests and weight of the 70-80 "orange diamonds" *would* result in his codefendant being charged.  It is important to note that Mr. Lauria does not speak hypothetically of impending charges; he discusses this as a most certain outcome of law enforcement's investigation.  Specifically, he says that Mr. Pepe is "gonna get charged," which underscores that Mr. Lauria *knew* of the illegal substance seized from Mr. Pepe's vehicle the previous night.  Thus, this conversation also supports probable cause.

The four pillars supporting Defendant's motion crumble under scrutiny.  Indeed, the four conversations, taken together as the "snowball" that they are, in addition to the other alleged facts in the August 2, 2024, affidavit, conclusively establish that there was a substantial basis for approving the wiretap application related to Mr. Lauria's phone.

## B. Necessity

Mr. Lauria raises necessity twice in his motion: in discussing the legal standard, and in his conclusion.  He does not substantively discuss necessity, or its absence, anywhere in his brief.  Nevertheless, the court will consider whether the affidavit satisfies the necessity standard.

Wiretaps typically might not be an initial step in an investigation, *United States v. Giordano*, 416 U.S. 505, 515 (1974), but they are not necessarily a method of last resort.  Title III does not require "that any particular investigative procedures must be exhausted before a wiretap may be authorized." *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (internal quotation and alteration omitted).  In fact, Title III does not "preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather [it] only require[s] that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the

difficulties inherent in the use of normal law enforcement methods." *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.1979) (internal quotation omitted). Therefore, as long the facts in the affidavit are "minimally adequate to support" the judge's determination of validity, necessity is established. *Miller*, 116 F.3d at 663; *see also United States v. Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997) ("so long as fundamental constitutional rights are preserved, the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking.'").

The wiretap applications exceeded the low threshold to establish necessity. Indeed, they offered robust discussion of alternative investigative methods which had been employed and which would continue to be used in addition those wire and electronic methods for which they sought approval. *See* Aug. Aff. ¶¶ 167–223. Mr. Lauria was mentioned over 30 times during this necessity justification. Among other things, investigators discussed the shortcomings of physical surveillance (*Id.* ¶¶ 171-72),[8] a grand jury subpoena (*Id.* ¶ 178), the lack of relationships between confidential informants and Mr. Lauria (*Id.* ¶¶ 181, 183), and the risks related to the use of undercover agents (*Id.* ¶ 183), and controlled purchases (*Id.* ¶ 185). *See United States v. Torres*, 901 F.2d 205, 232 (2d Cir. 1990) (upholding wiretap order where the application noted that confidential informants had minor role in the overall scale of operation). The court finds that necessity was clearly established in this case.

---

[8] The August 2, 2024, affidavit details an instance where Mr. Lauria was followed from West Haven to Manhattan, but investigators lost him in the hustle and bustle of New York City traffic. *Id.* ¶ 172; *see United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (upholding wiretap order where the application noted that physical surveillance impractical as it would have likely been conspicuous and drawn attention to the investigators).

## **CONCLUSION**

For the forgoing reasons, Mr. Lauria's motion to suppress, and for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), is **DENIED.**

**IT IS SO ORDERED** at Hartford, Connecticut, this 3rd day of October, 2024.

/s/
Omar A. Williams
United States District Judge